STATE OF MAINE                     SUPERIOR COURT
WALDO, SS.                           DOCKET NO. CV-19-51


| | |
|---|---|
| VK BREWER, LLC ) | |
|        Plaintiff ) | |
| ) | DECISION & JUDGMENT |
| v. ) | |
| ) | |
| JOHN DUFFELL ) | |
|        Defendant ) | |


## FACTUAL BACKGROUND AND FINDINGS

The Plaintiff operates a nursing home, Brewer Center for Health and Rehabilitation, (hereinafter referred to as "Brewer Center") at which the Defendant's mother, Irmguard Duffell, (hereinafter referred to as "Irmguard") was a resident for a period in the latter part of 2017 and early 2018. Irmguard, although originally a Defendant in this matter, died July 8, 2019, and was dismissed from the Complaint. The Defendant, John Duffell, is Irmguard's son, and the transferee of certain assets previously owned by Irmguard.

The specific asset, which is the subject of Brewer Center's claim based upon an alleged fraudulent transfer by Irmguard, was some portion of a $20,000 check made payable to Irmguard, and discovered by the Defendant sometime in July 2015. At the time the check was discovered in the home where Irmguard had previously been living, Irmguard was a resident at a

different long-term care facility. In 2015, when the check was discovered, that $20,000 represented substantially all of Irmguard's assets.

In 2006, Irmguard transferred her home to the Defendant by warranty deed, and retained a life estate in the same property. At the time of the 2015 transfer of the check proceeds, it was the Defendant's intent and hope that Irmguard would return from the nursing facility to live out her remaining days in the home she had transferred to her son. In order to accomplish that hoped-for result, certain repairs and improvements at the home were required to accommodate Irmguard's return.

Upon discovering the $20,000 check, the Defendant initially confirmed with the issuing bank that the instrument was still valid, and then sought advice from his attorneys as to how the proceeds of the $20,000 check should be handled. Specifically, the Defendant's attorney advised that the proceeds should be used for needed repairs on the house, and that once such spending was completed the Department of Health and Human Services (DHHS) should be informed of the details regarding the spending and repairs made to the home. (Plaintiff's Exhibit 11 and 12). The Defendant documented $18,982.49 in expenditures associated with the house at issue. (Plaintiff's Exhibit 13),[1] and provided that information to DHHS sometime in the Fall of 2015.

---

[1] Plaintiff's closing argument acknowledges that $560.92 of the $18,982.49 was paid for attorneys' fees and should be subtracted from the total spent toward "homestead related expenses."

2

DHHS concluded, based upon Mainecare eligibility regulations, that Irmguard's ownership percentage in the home resulting from her life estate interest in the home was 29.526%. (Plaintiff's Ex. 15). DHHS also concluded that the expenditure of the check proceeds for the home repairs not reflective of Irmguard's ownership percentage, constituted a transfer of assets for which she "did not get something of equal value." As a result of this conclusion, DHHS determined a transfer penalty would apply with respect to Irmgard's eligibility for payment for Nursing Home Level of Care. This Court has no basis upon which to challenge the ownership percentage utilized by DHHS, and therefore adopts the 29.526% figure as an appropriate measure for valuing Irmgard's life estate interest in the property which was repaired and improved in 2015.

Slightly over two years after the transfer of some portion of the $20,000 check proceeds was made, and the repairs to the home were completed, Irmguard became a long term care resident at the Plaintiff's Brewer Center facility. Because of the transfer penalty referred to above, Irmguard incurred charges from Brewer Center in the amount of $23,097.27 which were not covered by Mainecare, and which remained unpaid as of the time of the trial in this matter.

Near the time Irmguard began her stay with the Brewer Center facility, the Defendant and/or his wife, Pamela Duffell, provided the Plaintiff with a copy of the information they had received from DHHS regarding Irmguard's eligibility and potential transfer penalty. Personnel associated with the

3

Plaintiff provided assurances to the Defendant and/or his wife that a waiver of the transfer penalty would likely happen. The Defendant also reasonably anticipated that he would be receiving further assistance from the Plaintiff in formally pursuing such a waiver request with DHHS. No such waiver was ever formally requested or granted.

Plaintiff now contends it is entitled, in accordance with the Uniform Fraudulent Transfer Act, (UFTA) 14 MRSA §§3571 et seq., to a judgment, in its favor and against the Defendant transferee, in an amount reflecting some portion of the $20,000 transfer from 2015.

## LEGAL ANALYSIS

Section 3575 of the UFTA states, in pertinent part,

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

   A. With actual intent to hinder, delay or defraud any creditor of the debtor; or

   B. without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

      (1) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

4

> (2) intended to incur, or believed or reasonably should
> have believed that she would incur, debts beyond her
> ability to pay as the debts became due.

The Plaintiff contends that the transfer of at least some portion the $20,000 check proceeds to the Defendant in 2015 constituted a fraudulent transfer under either §3575(1)(A) or (B). This Court does not believe the Plaintiff has proven, by clear and convincing evidence, that there was "actual intent" to defraud sufficient to constitute a violation under subsection (A). Even applying the factors for determination of "actual intent" as set forth in §3575(2) the Court concludes that some of these factors applied to the transfer, while a significant number of the other listed statutory factors did not (eg. transfer was disclosed; before transfer debtor was not sued or threatened with suit; the debtor (or transferee) did not abscond; the debtor did not remove or conceal assets).

The Court does conclude, however, that the transfer of a certain amount of assets to the Defendant in 2015, in the nature of the improvement made to the home, was a transfer by which Irmguard did not receive a reasonably equivalent value and, at the time, she was engaged in a transaction involving her own nursing home care, for which her remaining assets were unreasonably small to cover. 14 MRSA §3575(1)(B)(1). Also, pursuant to §3575(1)(B)(2), given the need for nursing home care that the debtor was experiencing around the time of the transfer, she reasonably should have believed that she would incur debts beyond her ability to pay (without Mainecare coverage) as the debts became due.

5

To the extent this Court has concluded that there was a transfer of an asset in violation of the UFTA, the Plaintiff is entitled to a judgment against the Defendant, transferee in accordance with §3579(2). Any such judgment may be awarded to the creditor "for the value of the asset transferred, as adjusted under subsection 3, or the amount necessary to satisfy the creditor's claim, whichever is less." In this case, the asset transferred was less than the amount of the creditor's claim. Subsection 3 of section 3579 also requires that any judgment based upon an amount equal to the value of the asset at the time of the transfer, would be subject to "adjustment as the equities may require."

The Court concludes that the total amount of the improvements made in 2015 to the home owned by the Defendant, and subject to a life estate owned by Irmguard, equaled $18,421.57. Given the percentage ownership of Irmgard's life estate, (29. 526%), she received reasonably equivalent value in the amount of $5,439.15. The value of the asset transferred to the Defendant was, thus, the balance in the amount of $12,982.42.

It is that amount which must then be subjected to an "adjustment as the equities may require." This Court concludes that such an adjustment is required based upon the Plaintiff's own failure to meet its commitment to assist the Defendant with the waiver process involving DHHS. The Court finds that an equitable adjustment would reflect half of the value of the asset transferred to the Defendant.

Accordingly, the Court concludes that the Plaintiff is entitled to judgment against the Defendant in the amount of $6,491.21 plus interest and costs.

The Clerk is directed to incorporate this Decision & Judgment, by reference, in accordance with MRCivP 79(a).

Date: 10/20/2020

_____
SUPERIOR COURT JUSTICE

7